## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **KIRK TORGENSEN**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**SALT LAKE COUNTY et al,**<br><br>        **Defendants**. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>**Case No. 2:18-CV-00816-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on several motions: (1) Defendants' Motion for Summary Judgment; (2) Plaintiff's Motion for Summary Judgment; and (3) Defendants' Motion to Take Judicial Notice.[1] The court held a hearing on these motions on September 23, 2020. At the hearing, Plaintiff was represented by Dan R. Larsen, and Defendants were represented by Jacque M. Ramos. After carefully considering the memoranda and submitted by the parties and the facts and law relevant to the motions, the court enters the following Memorandum Decision and Order.

### BACKGROUND

***Defendants Seek to Secure Mr. Torgensen's Testimony***

On July 15, 2014, the State of Utah, through Salt Lake County District Attorney Sim Gill, initiated a criminal proceeding against John Swallow. The State identified Mr. Torgensen as a material witness because he had key information related to its case against Mr. Swallow. Sometime in early 2015, Mr. Torgensen met with prosecutors Chou Chou Collins and B. Fred

---

[1] Plaintiff did not object to Defendants' Motion to Take Judicial Notice. [Docket No. 39.] Thus, the court reviewed the materials referenced therein and will grant the motion.

Burmester to discuss what information Mr. Torgensen had related to the case against Mr. Swallow.

On May 15, 2015, the State of Utah filed its "Plaintiff's Preliminary Hearing Witnesses List" in the case against Mr. Swallow. The Preliminary Witness List identified Mr. Torgensen as a witness who would provide testimony at the preliminary hearing. Mr. Torgensen did not know about the list—or even that his name was on the list—and he was never called to testify at the hearing.

In October 2016, Mr. Torgensen moved to Florida without informing Defendants. Around that same time, Mr. Torgensen planned an international vacation for February and March 2017. Scott Reed, a long-time friend of Mr. Torgensen, testified that Mr. Torgensen had told him that he "was aware that he was an important witness in the [Swallow] case." The parties dispute whether Mr. Torgensen knew that he would be called as a witness prior to his move to Florida. Shortly after his move to Florida, Mr. Torgensen learned that a trial was scheduled for 2017 but disputes that he was ever aware of the exact trial dates.

On December 22, 2016, and February 6, 2017, the State of Utah filed a Witness List and an Amended Witness List, each identifying Mr. Torgensen as a witness to be called at the trial set for February 7, 2017. Mr. Torgensen claims he did not receive notice that he was on the December list, but concedes that he did know his name was on the February list and that he would be called to testify.

On or around January 3, 2017, the State of Utah served Mr. Reed and attempted to serve Mr. Torgensen subpoenas to appear at Mr. Swallow's trial. Mr. Reed, upon receiving his subpoena, reached out to Mr. Torgensen to see if he had also received a subpoena. Mr. Reed testified—and Mr. Torgensen denies—that both he and Mr. Torgensen knew they were going to

be called as witnesses. After talking with Mr. Torgensen about the subpoena, Mr. Reed informed Ms. Collins that Mr. Torgensen had moved to Florida and that Mr. Torgensen said he would be unavailable for trial because of his already-planned-and-paid-for vacation.

Ms. Collins was surprised to learn that Mr. Torgensen had moved to Florida and asked Mr. Reed for Mr. Torgensen's contact information. Mr. Reed, with Torgensen's permission, provided Ms. Collins with Mr. Torgensen's cell phone number and email. Mr. Reed also informed Ms. Collins that Mr. Torgensen would be vising Utah in a few weeks for Mr. Torgensen's mother's funeral and saying at Mr. Reed's home. At this point, Ms. Collins was already concerned that Mr. Torgensen would not appear for the trial and began thinking about seeking a material witness warrant. Ms. Collins planned to serve a trial subpoena on Mr. Torgensen when he arrived in Utah.

***Serving the Subpoena***

On January 8, 2017, Lt. Courtney Nelson personally served Mr. Torgensen at Mr. Reed's home with a subpoena to appear at trial. Lt. Nelson recorded the audio of his communications with Mr. Torgensen. During the service, it is undisputed[2] that Mr. Torgensen: refused to sign the subpoena; would not provide his Florida address; told Lt. Nelson that he had already informed prosecutors that he would be out of the country and unavailable on the dates in question; was willing to alter his out-of-the-country plans if he was fully reimbursed; and told Lt. Nelson that he was willing to secure his testimony by other means. Lt. Nelson contacted Ms. Collins following the service of the subpoena to inform her of the details of his interaction with Mr. Torgensen.

---

[2] The parties do dispute, however, the reasons about why Mr. Torgensen refused to give his address or sign the subpoena. Plaintiff also argues that Defendants are downplaying the extent to which he was willing to cooperate. This is a major point of contention throughout this matter.

From January 3 through January 8, 2017, Mr. Torgensen and Ms. Collins had a few telephone conversations where they tried to make arrangements so that Mr. Torgensen could testify. Mr. Torgensen unsuccessfully attempted to change his travel plans and none of these conversations between Ms. Collins and Mr. Torgensen resulted in a definitive plan. Additionally, the parties disagree whether Ms. Collins stated that Salt Lake County would definitely reimburse Mr. Torgensen for the costs associated with the changes he would have to make to his trip, whether Mr. Torgensen refused to tell Ms. Collins the details of his trip,[3] and whether Ms. Collins actually requested specific travel information from Mr. Torgensen. Nevertheless, Ms. Collins testified in her deposition that she felt Mr. Torgensen would likely fail to appear at the trial and that she never received an unequivocal commitment from Mr. Torgensen that he would appear. Therefore, Ms. Collins began the process of seeking a material witness arrest warrant.[4]

***Obtaining the Material Witness Warrant***

On January 9, 2017, Lt. Nelson drafted an affidavit in support of the material witness arrest warrant application (the "Application") for Mr. Torgensen. In his affidavit, Lt. Nelson attested that Mr. Torgensen stated that he: "would be out of the country. . . on a travel plan" and "unavailable" for the trial dates; would not attend unless "you want to pay me all the money I'm going to lose"; was willing to help the prosecutor secure his testimony by other means before leaving on vacation; and would be returning home to Florida on January 10, 2017. That same day, Ms. Collins or Mr. Burmester asked prosecutor Sam Sutton to draft the Application and an affidavit in support.

---

[3] The record indicates that Mr. Torgensen did tell Ms. Collins vague details about his trip.
[4] The record indicates that Ms. Collins contemplated this process earlier than that—even before Mr. Torgensen arrived in Utah.

4

While preparing the Application and supporting documents, Mr. Sutton reviewed the audio recording of Lt. Nelson's service of the subpoena on Mr. Torgensen. Mr. Sutton believed that the entirety of the recording indicated that Mr. Torgensen was not going to comply with the subpoena and that Mr. Torgensen's statements offering to secure the testimony by other means were not material or relevant to the Application. Mr. Sutton cannot recall whether he reviewed the language from Rule 7(*l*) of the Utah Rules of Criminal Procedure (pertaining to the requirements for seeking a material witness arrest warrant) before drafting the Application.

Specifically, Mr. Sutton's affidavit and the Application state that he "believe[d] that KRIK TORGENSEN will not appear and testify unless bond is required as proscribed in Rule 7(*l*), Utah Rules of Criminal Procedure" because Mr. Torgensen: stated that "he will not attend" the trial; "has no reliable local address"; and "intends to leave the State of Utah shortly, with no plans to return permanently." Mr. Sutton also stated he believed Mr. Torgensen "would likely flee from Utah and not appear pursuant to subpoena" and "would have nothing to lose by leaving the jurisdiction rather than remaining and giving testimony."

When the Application was complete, Mr. Sutton sent a draft to Ms. Collins and Mr. Burmester for review and approval. Ms. Collins told Mr. Sutton to revise the draft because "[s]imply being out of the state is not a good reason for a material witness warrant" and instructed Mr. Sutton to include the language that Mr. Torgensen would be out of the country. After making those edits, Mr. Sutton asked Ms. Collins if he should include the fact that Mr. "Torgensen does tell [Lt. Nelson] he's willing to do whatever else it takes to preserve his testimony short of being present for the trial in February." Ms. Collins never responded and Mr. Sutton did not include that information.

On January 9, 2017, Mr. Sutton presented the Application, supporting affidavits, and a copy of the audio recording to Judge Hruby-Mills. After reviewing the submitted materials, Judge Hruby-Mills issued the material witness arrest warrant (the "Warrant").

### Executing the Material Witness Arrest Warrant

On Monday, January 9, 2017, federal agents appeared at Mr. Reed's home to execute the Warrant. Mr. Torgensen was shocked by the Warrant and asked if he could speak to Ms. Collins on the phone. During the phone call, Mr. Torgensen asked Ms. Collins not to execute the Warrant and continued to try and reassure Ms. Collins that he would make accommodations and testify.[5] Ms. Collins briefly considered Mr. Torgensen's offers and, after speaking with her co-counsel, told the federal agents to arrest Mr. Torgensen. The federal agents and Mr. Reed, who were all present during the execution of the Warrant, testified that Mr. Torgensen tried to indicate to Ms. Collins that he would cooperate in testifying. After his arrest, the officers took Mr. Torgensen to the Salt Lake County Jail where he was booked, strip-searched, and placed in the general population with other inmates.

On January 10, 2017, at his bond hearing, Mr. Torgensen filed a Motion to Quash, arguing that he had accepted the trial subpoena, had communicated to Defendants that he had a conflict with the trial dates, and that he had offered alternatives to preserve his testimony. At the conclusion of the hearing, the judge ordered Mr. Torgensen to be present at trial to testify, post bond, surrender his passport to his attorney, provide all counsel with his cell phone number and home address in Florida, and then ordered Mr. Torgensen be released from custody.

---

[5] Mr. Torgensen said the following: (1) he would provide his trial testimony, one way or another; (2) he would never leave Ms. Collins "high and dry"; (3) he would provide Ms. Collins his Florida address so she could secure and interstate witness rendition warrant if she wanted; and (4) it was unnecessary to arrest him to secure his testimony. Mr. Torgensen also offered to "meet at 8:00 in the morning" to "figure this all out."

***Salt Lake County Material Witness Arrest Warrant Policy, Custom, or Procedure***

Salt Lake County does not have a written policy or procedure for seeking material witness arrest warrants. Mr. Burmester testified that it is sometimes the County's practice to seek a "material arrest warrant before seeking a bond because [the County] was dealing with a gang crime, domestic violence victim who was reluctant to testify, [] a transient who was likely difficult to locate[,] . . . or maybe prostitutes that might be uncooperative." Sim Gill, however, notes that the District Attorney's office has a general, unwritten procedure whereby an attorney who believes that the facts and circumstances indicate that a material witness warranted is necessary will "present their case or inform [Mr. Gill] or other senior attorneys." If Mr. Gill or the senior attorney believes there is a compelling case to proceed with the warrant, they will allow the trial attorney to prepare and proceed with the application "in conformance with the procedures and understood practices as set forth by the Rules of Criminal Procedure, Utah law, and the court's interpretation and application of the same."

***The Complaint***

On October 18, 2018, Mr. Torgensen filed a complaint against Sim Gill, Ms. Collins, Mr. Sutton, Mr. Burmeister, Lt. Nelson (the "Individual Defendants"), Salt Lake County, and Salt Lake County District Attorneys' Office (the "County" or "County Defendants").[6] The Complaint contains only two causes of action. First, Plaintiff alleges violations of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983. Second, Plaintiff alleges violations of his rights under Article 1, section 14 of the Utah Constitution. It is unclear if Plaintiff's Utah Constitution claim is pursuant to 42 U.S.C. § 1983 or Utah common law.

---

[6] Defendants Sim Gill and Fred Burmester have since been dismissed from the lawsuit.

DISCUSSION

Both parties move for summary judgment on the two claims asserted in Complaint. The court will address both parties' (1) motions on the Section 1983 claim and (2) then the motions on the Utah Constitution claim.

## I.  Section 1983 Claims

Defendants move for summary judgment on the Section 1983 claim on four grounds: (A) the claims against the Individual Defendants and the County Defendants are duplicative and, therefore, the court should dismiss the Individual Defendants; (B) Ms. Collins and Mr. Sutton are entitled to absolute immunity; (C) the Individual Defendants are entitled to qualified immunity; and (D) the Plaintiff cannot meet his burden to show the County Defendants are liable under the *Monell* framework. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The court will address each argument in turn.

### A.  Dismissal of Individual Defendants in Their Official Capacities

Defendants argue that the Individual Defendants should be dismissed because the Plaintiff names both individuals in their official capacity in the same claims that he names the County Defendants. Defendants are correct that courts routinely find that suits against "a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 695 (10th Cir. 1988). However, the caselaw does not show that <u>*claims*</u> against a municipality and the official acting in his or her official capacity are the same or that, in these situations, courts dismiss the individuals. In fact, as this case demonstrates, having a claim against individuals in their official capacity and against the municipality often requires different types of proof to establish liability. For example, the claims against the County require a showing that it had a deficient policy or custom, which is

8

different from the showing required to overcome qualified immunity for the claims against the Individual Defendants. Accordingly, dismissing the Individual Defendants at the outset would be premature.

### B. Absolute Immunity

Defendants argue that both Ms. Collins and Mr. Sutton are entitled to absolute immunity. Specifically, Defendants argue the alleged actions (*e.g.*, considering, preparing, reviewing, and submitting the Application) are activities "intimately associated with the judicial phase of the criminal process," and, therefore, Ms. Collins and Mr. Sutton are protected by absolute immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *see also Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). The court disagrees that Mr. Sutton is entitled to absolute immunity but finds that Ms. Collins was performing a function properly protected by absolute immunity.

### *Mr. Sutton*

The parties do not dispute that Mr. Sutton signed an affidavit swearing to the truth of certain facts supporting the probable cause determination. Plaintiff argues that in so doing, Mr. Sutton was not engaged in a function protected by absolute immunity. The court agrees.

When a prosecutor signs an affidavit in support of the facts contained in an arrest warrant application, he or she is no longer advocating but attesting to the truthfulness of the facts—which is not a function protected by absolute immunity. *See Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) (holding that "[t]estifying about facts is the function of the witness, not of the lawyer"). Some circuits have distinguished material witness arrest warrants from standard arrest warrants and held that material witness arrest warrants are unique and should entitle those involved to absolute immunity. Such an interpretation runs afoul of the Supreme Court's holding in *Kalina*, 522 U.S. 118 (1997).

In *Kalina*, the Supreme Court was deciding whether a prosecutor who allegedly made false statements in an arrest warrant application was entitled to absolute immunity. *Id.* at 120. There, the prosecutor "personally vouched for the truth of the facts set forth in the [application] under penalty of perjury." *Id.* The court held that the "drafting of the certification, determination that the evidence was sufficiently strong to justify a probable cause finding, decision to file charges, and presentation of the. . . motion to the court" were all appropriately characterized as activities that are protected by absolute immunity. *Id.* at 130. But, the Court held that absolute immunity is improper where a prosecutor "[testifies] about facts" because doing so "is the function of the witness, not of the lawyer." *Id.* Accordingly, the court concluded that the prosecutor in attesting to the facts was entitled to only qualified immunity. *Id.*

The language in *Kalina* does not give courts discretion to determine whether attesting to the facts in different types of warrants is subject to a different analysis. Here, Mr. Sutton swore to the truth of the facts that supported the Utah court's probable cause finding. Accordingly, Mr. Sutton is not entitled to absolute immunity because he was acting as a complaining witness, not an advocate.

### Ms. Collins

Plaintiff argues that Ms. Collins is not entitled to absolute immunity because she was acting as an investigator of the facts to support a potential probable cause finding for the material witness arrest warrant. Defendants retort that seeking a material witness arrest warrant is a function "intimately associated with the judicial phase of the criminal process" and, therefore, protected by absolute immunity. The court agrees with Defendants.

"The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). Under this

function test, when a prosecutor performs "functions as an administrator rather than as an officer of the court" he or she is not covered by absolute immunity. *Id.* at 431, n. 33. Courts have noted that

> [t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.

*Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (citation omitted). This is often a difficult balancing act and courts are guided by this principle: "The more distant a function is from the judicial process and the initiation and presentation of the state's case, the less likely it is that absolute immunity will attach." *Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000). Seeking a material witness arrest warrant is certainly close to the presentation of the state's case.

While there is no Tenth Circuit caselaw addressing absolute immunity for seeking a material witness arrest warrant, both the Second and Seventh Circuits have held that prosecutors are absolutely immune from suit when seeking such warrants. The Seventh Circuit held that when a prosecutor is "attempting to secure [a witness's] presence at the resumption of the trial, [courts] must consider that [s]he was functioning as an advocate rather than as an investigator or administrator." *Daniels v. Kieser*, 586 F.2d 64, 69 (7th Cir. 1978).[7] Similarly, the Second Circuit distinguished material witness arrest warrants from a typical arrest warrant and held a prosecutor was immune from suit despite submitting an affidavit that contained allegedly false information. *Flagler v. Trainor*, 663 F.3d 543, 548–49 (2d Cir. 2011).

---

[7] Notably, this case was decided before *Kalina v. Fletcher*, 522 U.S. 118 (1997).

The *Flagler* court noted that *Kalina v. Fletcher* "[was] easily distinguishable" because, in *Kalina*, the Supreme Court was dealing with an arrest warrant, which "is one of the first steps required to begin a criminal investigation." *Id.* at 548. The court then explained that the differences allow absolute immunity to attach to seeking a material witness arrest warrant because "[a] material witness order. . . may issue only when a prosecution is ready for trial." Thus, the court concluded that

> [s]eeking a material witness order is within the prosecutor's function as an advocate. A prosecutor employs prosecutorial discretion when determining whether to seek such an order. It is an act intimately associated with presenting the State's case. The material witness order ensures the attendance of a material witness at trial, which often makes or breaks the prosecutor's case.

*Id.* at 548–59 (internal citations and quotation marks omitted). The court agrees with this reasoning.

Both *Flagler* and *Daniels* are factually similar, persuasive, and consistent with *Kalina* insofar as they pertain to Ms. Collins' role in this case. *See Kalina*, 522 U.S. at 132 (noting that "there is absolute immunity for the decision to seek an arrest warrant. . .") (Scalia, J. concurring). Here, Ms. Collins was simply ensuring that a material witness was present for trial. This function is intimately associated with her role in the judicial process and the presentation of the State's case against John Swallow. It would be improper for the court to extract Ms. Collins' actions in seeking the Warrant from her overall role as a prosecutor in the Swallow trial. Thus, when Ms. Collins' actions are viewed in this context, her inquiries into Mr. Torgersen's plans and her impressions about the likelihood of his attendance are not fairly categorized as investigative activities. Rather, Ms. Collins' inquiries and impressions simply informed her in her prosecutorial determination about whether to seek the Warrant. Accordingly, the court finds that her actions were functions of an advocate for the State in its case against John Swallow.

For the foregoing reasons, the court finds Ms. Collins is absolutely immune from suit. Mr. Sutton, however, is entitled to only qualified immunity.

### C. Qualified Immunity

As an initial matter, the court will disregard all of Plaintiff's arguments regarding Defendants' failure to seek a bond. Section 1983 claims cannot be based on state law violations. *See Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) (holding that "even though [the plaintiff] alleges a violation of the Utah Constitution, a violation of state law alone does not give rise to a federal cause of action under § 1983."); *see also Armstrong v. Asselin*, 734 F.3d 984, 989 (9th Cir. 2013) (holding that a "violation of the Alaska constitution alone does not establish a basis for a § 1983 lawsuit."); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005) ("[A] claimed violation of a state constitutional right is not cognizable under §1983." (collecting cases)); *Bookman v. Shubzda*, 945 F. Supp. 999, 1009 (N.D. Tex. 1996). Thus, even if Plaintiff is correct that the Utah Rules of Criminal Procedure require a bond before an arrest and that failing to do so is a violation of Utah's Constitution, such circumstances do not give rise to a cognizable claim under Section 1983. Accordingly, the court will only focus on arguments that go to whether Defendants violated Plaintiff's Fourth Amendment rights by submitting the Application with allegedly false statements and material omissions.

Qualified immunity "is immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, even when state officials act reasonably—although mistakenly—and violate a person's constitutional rights, the official "should not be held personally liable." *Id.* at 344–45.

In determining liability under this doctrine, courts typically apply a two-part test. First, the court must determine if a constitutional violation occurred. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *receded from in part by Pearson v. Callahan,* 555 U.S. 223 (2009). If a constitutional violation is established, the court must determine if the right was "clearly established" at the time of the violation. *Id.* Here, the court need not spend time on whether submitting an arrest warrant application with false statements or material omissions is a "clearly established" violation of constitutional rights because the caselaw is clear that it is. *See Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990 (holding that it is "a clearly established violation of [a] plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause"); s*ee also Franks v. Delaware*, 438 U.S. 154 (1978). Thus, the court need only to focus on whether an actual violation of Plaintiff's rights occurred.

A plaintiff must satisfy the three-part test developed in *Franks v. Delaware* in a suit under Section 1983 alleging misrepresentations or omissions in an arrest warrant application or affidavit. 438 U.S. 154 (1978). Under this test, a plaintiff must "make[] a substantial preliminary showing" that the defendant: (1) made "a false statement knowingly and intentionally, or with reckless disregard for the truth"; (2) the false statement "was included by the affiant in the warrant affidavit"; and (3) "the allegedly false statement [was] necessary to the finding of probable cause." *Id.* at 155–56.

Regarding alleged false statements, courts do not require that statements be completely accurate; "[a]llegations of negligence or innocent mistake are insufficient." *Id.* at 171. Indeed, information "sometimes must be garnered hastily" and the law only requires that affidavits are "'truthful' in the sense that the information put forth is believed or appropriately accepted by the

14

affiant as true." *Id.* at 165. Accordingly, "[o]missions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Smith*, 588 F.2d 737, 740 (9th Cir. 1978). Similarly, a plaintiff alleging omissions "must show the facts were omitted with the intent. . . to make the affidavit misleading." *United States v. Clapp*, 46 F.3d 795, 799 (8th Cir. 1995). "Mere negligence or innocent mistake is insufficient to void a warrant." *United States v. Allerheiligen*, 221 F.3d 1353, *3 (10th Cir. 2000) (citing *Franks*, 438 U.S. at 171 and *Clapp*, 46 F.3d at 800–01) (unpublished table decision).

To establish that an alleged false statement was reckless, the burden falls upon the plaintiff to show that "the affiant in fact entertained serious doubts as to the truth of his allegations." *Id.* Similarly, regarding omissions, "[r]ecklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Id.* (citation omitted). After a plaintiff has established an officer recklessly submitted false statements or omitted material information, "[t]he reviewing court must then determine whether, either absent the false material or supplemented with the omitted material, the affidavit's remaining contents are sufficient to establish probable cause." *Clapp*, 46 F.3d at 799 (citing *Franks*, 438 U.S. at 156).

In this case, Plaintiff alleged that Lt. Nelson made only material omissions, Mr. Sutton made both material omissions and false statements, and that Ms. Collins essentially supervised the arrest warrant application process and the actual arrest of Plaintiff.[8] In deciding whether an officer is entitled to qualified immunity, courts typically look at the conduct and intention of

---

[8] Although the court already found that Ms. Collins is entitled to absolute immunity, it nonetheless addresses her claim to qualified immunity.

each officer individually. Here, however, Plaintiff's allegations about Lt. Nelson and Mr.

Sutton's omissions are almost indistinguishable so this memo considers them together. After

addressing the omissions, the court will examine Mr. Sutton's allegedly false statements and then

address Ms. Collins' alleged unconstitutional conduct.

***Mr. Sutton and Lt. Nelson's Alleged Omissions***

Plaintiff alleges Mr. Sutton and Lt. Nelson made the same omissions. The following is

the list of all the omissions as alleged by Plaintiff:

a. Mr. Torgensen was a former career prosecutor at the AG's Office.

b. Mr. Torgensen met with Troy Rawlings, the Davis County Attorney, and also gave an interview at FBI headquarters.

c. In 2016, Mr. Torgensen met with Ms. Collins and Mr. Burmester to discuss a case that they were putting together against Tim Lawson, spending approximately 4 hours with them.

d. Mr. Torgensen was interviewed by Paul Cassell and Fran Wikstrom, spending approximately 8 hours with them and answering all questions they asked of him.

e. Mr. Torgensen previously tape recorded a conversation with a criminal suspect in the investigation to assist Defendants.

f. Defendants had not spoken with Mr. Torgensen for approximately a year and a half and had not told him he was going to be a witness until at or around the time he was served with the subpoena in early January.

g. Salt Lake County had not agreed to reimburse Mr. Torgensen's lost travel expenses, or in the alternative, to pay for his flight to Utah to testify at trial.

h. The subpoena unreasonably required Mr. Torgensen to be at the courthouse on February 7th through March 3d—nearly an entire month.[9]

---

[9] The record does not support this allegation. In the unofficial transcript of Lt. Nelson serving the subpoena on Plaintiff, Lt. Nelson clearly states that Plaintiff was only expected during the first two weeks of the trial.

**i.** Mr. Torgensen had offered to testify via deposition as permitted under Utah R. Crim. P, Rule 14, if necessary.

**j.** Defendants already had Mr. Torgensen's Florida address and did not need it.

**k.** Defendants knew Plaintiff would be in Utah on January 7th through 10th.[10]

**l.** Mr. Torgensen was not fleeing the state on January 10th, he was merely heading back to his home in Florida after coming to Utah to attend his mother's funeral.[11]

**m.** Mr. Torgensen voluntarily told Defendants that he would be back in Salt Lake later in the month.[12]

**n.** Mr. Torgensen had already made certain reservations and incurred certain expenses before Defendants notified Mr. Torgensen of the trial dates and that he was a material witness.

**o.** Mr. Torgensen told Lt. Nelson that he understood his obligations under the subpoena.

**p.** The affidavits omit the following specific statements made by Mr. Torgensen:

    **1)** "You know what, if they want to make arrangements to do this in a way that I can accommodate you, I will do it."

    **2)** "Let them know I'm probably going to be back here at the end of the month . . . I'm scheduled to testify [as an expert] January 31st and if they want to do something to do a video deposition or whatever they have to do, I'm happy to accommodate them."

    **3)** "This is not me not wanting to cooperate because I've met with them I don't know how many times."

    **4)** "And I'm happy to accommodate you guys. I'll do whatever it takes. I, you know I do not, this, for me this is not, not wanting to help."

Most of these omissions fail to meet the *Franks* requirements because they are immaterial or irrelevant[13] and Plaintiff has not shown that Lt. Nelson or Mr. Sutton knew or should have

---

[10] This is not an omission. Lt. Nelson clearly included this in his affidavit.

[11] This is not an omission. Lt. Nelson clearly included this in his affidavit.

[12] This is not an omission. Lt. Nelson clearly included this in his affidavit.

[13] Specifically, a–f are irrelevant. These alleged omissions do not speak to Mr. Torgensen's probability of complying with the subpoena to testify in the Swallow trial.

known about many of these alleged omissions. Some of these omissions, however, are potentially relevant and material. Specifically, the court will address the materiality of the alleged omissions that Defendants knew Plaintiff's Florida address and Plaintiff's assurances that he would make accommodations.

First, Defendants' knowledge of Plaintiff's Florida address is immaterial because Plaintiff did not know that Defendants had his address. Thus, Plaintiff's refusal to give his Florida address is still evidence that he may not comply with the subpoena. Furthermore, the evidence Plaintiff relies upon to show Defendants had his address states "it is unknown at this time if this is his current address." Thus, while Plaintiff asserts Defendants "knew" his Florida address, Defendants' records show they were, at best, unsure.

Second, not including Plaintiff's repeated assurances that he would comply is simply Plaintiff's opinion versus the Individual Defendants' impressions of Plaintiff's level of compliance. Ms. Collins, Lt. Nelson, and Mr. Sutton all testified that despite Plaintiff's assurances they were not confident that Plaintiff would appear and testify. Indeed, Plaintiff never gave an unequivocal promise to do so.[14] Furthermore, many of the omissions were not actually omissions. Defendants submitted in its Application the audio of Lt. Nelson serving the subpoena on Plaintiff and, therefore, the quotes listed above were not actually omitted from the Application.[15] If Defendants submitted the audio and Judge Hruby-Mills declined to listen to it, Plaintiff cannot claim the information was omitted.

---

[14] The court wishes to note that Plaintiff is correct that the law does not typically require such an unambiguous commitment. In this instance, however, Plaintiff made repeated statements indicating his unwillingness or inability to comply with the subpoena unless it was on his terms. Thus, the Defendants properly sought unambiguous assurances and were justifiably concerned Plaintiff would not comply.

[15] In fact, the alleged omissions listed in h–p above were captured in the audio recording submitted in the Application.

For the foregoing reasons, the court finds that none of the alleged omissions satisfy the first or third prong of the *Franks* test. Namely, Plaintiff cannot establish that the omissions were made "knowingly and intentionally, or with reckless disregard for the truth" or that including the information would have vitiated the court's finding of probable cause. Thus, since Plaintiff has not alleged Lt. Nelson made any false statements, he is entitled to qualified immunity and the claims against him are dismissed. This leaves only Mr. Sutton's allegedly false statements and Ms. Collins' supervision.

### Mr. Sutton's Allegedly False Statements

Plaintiff alleges that Mr. Sutton made false statements in his affidavit in support of the Application. The following are the three false statements as Plaintiff alleges them:

a. Mr. Sutton misquoted Mr. Torgensen when Mr. Sutton represented that "KIRK TORGENSEN stated to the process server he will not attend the upcoming trial in this matter."

b. Mr. Sutton falsely claimed that if Plaintiff "is released from custody with no bail or order from this Court that he would likely *flee* from Utah and not appear pursuant to subpoena." (emphasis added).

c. Mr. Sutton had no basis for stating that "KIRK TORGENSEN would have nothing to lose by leaving the jurisdiction."[16]

At the outset, the court notes that these are arguably not factual statements at all. Rather, these could be construed as Mr. Sutton's impressions of Plaintiff's conversation with Lt. Nelson. Even if the court construes these as factual statements, they cannot meet the necessary standards.

In Mr. Sutton's deposition, he states that this language was likely from a template the County used to draft material witness arrest warrants. Therefore, these statements do not meet the "reckless disregard" standard that the "affiant in fact entertained serious doubts as to the truth

---

[16] Mr. Sutton testified that he was "speculating" when he wrote this.

of his allegations." *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir.1991) (internal quotations omitted). The record merely indicates that Mr. Sutton may have mistakenly used a form with hyperbolic language. It is certainly not evidence that Mr. Sutton made these statements knowingly or that they were reckless or unreasonable given his knowledge of Plaintiff's actions and statements. Furthermore, if the court removes the hyperbolic language, the Application still supports a finding of probable because there is a reasonable inference the Plaintiff would not cooperate with the subpoena unless it was on his terms. Accordingly, the court finds that the Warrant was valid and no constitutional violation occurred.

Thus, for the foregoing reasons, the court will dismiss the claims against Mr. Sutton because Plaintiff cannot meet the first or third prong of the *Franks* test. Namely, Plaintiff cannot establish that Mr. Sutton made "a false statement knowingly and intentionally, or with reckless disregard for the truth" or that "the allegedly false statement [was] necessary to the finding of probable cause."

### Ms. Collins' Supervision

Since the court already concluded that the material witness arrest warrant was supported by probable cause and, therefore, there was no constitutional violation, the court finds that Ms. Collins is also entitled to qualified immunity. This is the logical holding because Plaintiff does not allege that Ms. Collins made any materially false statements or omissions. Rather, Plaintiff complains about Ms. Collins' role as the supervisor and instructor (*e.g.*, instructing Mr. Sutton to draft and file the Application, telling Lt. Nelson how to handle service of the subpoena, and instructing the arresting officers to execute the Warrant). Accordingly, if the Warrant was valid, Ms. Collins cannot be liable for: instructing the FBI officers to execute the valid Warrant; deciding to peruse the Warrant because it was ultimately found to be supported by probable

cause; or instructing Lt. Nelson to get Plaintiff to "actually tell [him] that he cannot appear to testify" because this was already known by the Defendants and Plaintiff volunteered this information before Lt. Nelson could even ask or inquire.

Thus, for the foregoing reasons, the court finds that all of the Individual Defendants are entitled to qualified immunity. Accordingly, the court dismisses the Section 1983 claims against Ms. Collins, Mr. Sutton, and Lt. Nelson.

### D.  County Policies

Defendants argue that the County Defendants should be dismissed because Plaintiff has not demonstrated the existence of an official policy or custom or that the County decisionmakers acted with the requisite state of mind. The court agrees.

Under Section 1983, municipalities cannot "be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691. A plaintiff must prove that the constitutional violation occurred because of the municipality's action or inaction, not solely because of the actions of one of the municipality's employees. *See id.* (concluding that "a municipality cannot be held liable solely because it employees a tortfeasor"). Accordingly, the violation must be the result of an official municipal policy, which includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Id.* at 690–91 (internal citations and quotations omitted). Thus, to be successful in a Section 1983 claim against a municipality, the plaintiff must establish three elements: "(1) official policy and custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013).

Relevant here, an official policy or custom may take the form of: "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law"; "the decisions of employees with final policymaking authority"; "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or the "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal citations omitted). Under an inadequate training or widespread practices theory, a plaintiff must ordinarily demonstrate "[a] pattern of similar constitutional violations by untrained employees . . . [because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citation omitted).

Similarly, to establish the state of mind of element, a plaintiff must "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (citations omitted). State of mind is usually established through "proving the existence of a pattern of tortious conduct" but in narrow circumstances may be established "if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id*. at 771 (citation omitted). Plaintiff has not met established the existence of a County policy, custom, or practice or that the County acted with the requisite state of mind.

Plaintiff has not demonstrated that the County had a constitutionally deficient policy or custom or that it failed to adequately train its employees because Plaintiff has only based his claim on violations of state law (Utah Rules of Criminal Procedure, Rule 7(*l*) (2017)). As noted, state law violations cannot serve as an independent basis for a Section 1983 claim. *See* Part I.C., *supra*. Even if the alleged violation of Rule 7(*l*) could serve as a basis for Section 1983, Plaintiff's claim fails for five additional reasons.

First, Plaintiff can only point to Mr. Burmester's deposition where he states that the County sometimes did not seek bonds when dealing with gang crime, domestic violence victims, transients, or prostitutes because they are typically uncooperative or difficult to locate. Mr. Burmester's statement is inadequate evidence to create an issue of material fact because it is evidence of a possible state procedural violation and therefore cannot support a Section 1983 claim. Second, Mr. Burmester's statement is a single pronouncement from a non-decisionmaker and is insufficient to establish that the county had a "widespread" policy or custom. Third, Plaintiff does not point to a single other instance where the County did not seek a bond prior to arrest or omitted material information or made false statements in its arrest warrant applications.[17] Fourth, Plaintiff has not alleged or argued that the County or its officials acted with "deliberate indifference." Fifth, Mr. Gill's testimony is not fairly read as giving County prosecutors unsupervised, unlimited permission to seek material witness arrest warrants. Mr. Gill's testimony actually shows that a prosecutor must comply with the relevant laws and must first make a compelling case to a senior prosecutor as to why such a warrant is necessary.

---

[17] In fact, Defendants' Exhibits 21 and 25 show that since 2010, Salt Lake County has had over 60 civil rights cases filed against it. Plaintiff does not use any of these cases to show that the County has engaged in similar conduct.

For the foregoing reasons, the court dismisses the Section 1983 claims asserted against the County Defendants.

## II.    <u>Utah Constitution Claim</u>

At the outset, the court notes that Plaintiff did not make clear whether he is seeking his claim for violation of his rights under the Utah Constitution pursuant to Section 1983 or Utah common law. To the extent Plaintiff seeks recovery for such violations pursuant to Section 1983, the court grants summary judgment in favor of Defendants because Section 1983 only applies to violations of federal law. *See* Part I.C., *supra*. If, on the other hand, Plaintiff is seeking to establish his Utah Constitutional claim under Utah common law, both parties did not cite to the correct legal analysis and, therefore, the court cannot grant either party's motions. *See Jensen ex rel Jensen v. Cunningham*, 250 P.3d 465, 480–81 (Utah 2011) (outlining Utah law for establishing liability for Utah Constitutional violations); *see also Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533, 534 (Utah 2000).

Thus, for the foregoing reasons and pursuant to 18 U.S.C. § 1367 (c)(1), (3), the court declines to exercise supplemental jurisdiction over the Utah Constitutional claim to the extent it is asserted under Utah Common law and dismisses the claim without prejudice. Plaintiff may pursue this claim under Utah common law in state court to the extent the law so permits.

CONCLUSION

Based on the above reasoning: Defendants' Motion to Take Judicial Notice [Docket No. 37] is GRANTED; Plaintiff's Motion for Summary Judgment [Docket No. 52] is DENIED; and Defendants' Motion for Summary Judgment [Docket No. 36] is GRANTED IN PART as to the Section 1983 claim and DENIED IN PART as to the Utah Constitution claim. Pursuant to 18 U.S.C. § 1367 (c)(1) and (3), the court declines to exercise supplemental jurisdiction over the

remaining Utah Constitution claim. Accordingly, the Utah Constitution claim is dismissed without prejudice.

DATED this 29th day of September, 2020.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge